Humphrey L. SHUFORD,
et al., Plaintiffs,

v.

ALABAMA STATE BOARD
OF EDUCATION, et
al., Defendants.

Civ. A. No. 89–T–196–N.

United States District Court,
M.D. Alabama, N.D.

March 15, 1994.

---

Terry G. Davis, Terry G. Davis, P.C., J. Mark Englehart, Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for Humphrey L. Shuford.

James U. Blacksher, John C. Falkenberry, Leslie Proll, Joe R. Whatley, Jr., Cooper,

Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for Connie Johnson.

James U. Blacksher, Joe R. Whatley, Jr., Rebecca H. Hunt, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for Karen Newton.

Terry G. Davis, Terry G. Davis, P.C., Anita L. Kelly, Kenneth Lamar Thomas, Thomas, Means & Gillis, P.C., Montgomery, AL, for Kenneth A. Brackins.

Thomas T. Gallion, III, Haskell, Slaughter, Young, Johnston & Gallion, Montgomery, AL, Beverly Ann Poole Baker, Richard H. Walston, Haskell, Slaughter, Young & Johnston, P.A., Birmingham, AL, for Myra P. Davis, Sheryl B. Threatt.

J. Mason Davis, Birmingham, AL, Edward M. George, Dept. of Postsecondary Educ., Montgomery, AL, J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Jeffery A. Foshee, Montgomery, AL, for Alabama State Bd. of Educ., Fred Gainous, John M. Tyson, Jr., Stedman Shealy, Jr., Isabelle Thomasson, Ethel Hall, Willie Paul, Spencer Bachus, Victor Poole, Evelyn S. Pratt.

J. Mason Davis, Birmingham, AL, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, AL, J. Allen Schreiber, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Terry Alan Sides, Montgomery, AL, for Malcom A. Jones.

J. Mason Davis, Birmingham, AL, Randall C. Morgan, Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, AL, J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, Jeffery A. Foshee, Montgomery, AL, for Larry McCoy, Northwest Shoals Community College, Atmore State Technical College, Betty Fine Collins, Tazewell Shepherd, Dan Cleckler, Bevill State Community College, Harold Wade.

#### ORDER

MYRON H. THOMPSON, Chief Judge.

Plaintiff Humphrey L. Shuford, an African–American, initially brought this employment discrimination lawsuit claiming that he had been denied promotions in Alabama's postsecondary educational system because of his race. He named as defendants the Alabama State Board of Education and its chancellor and individual board members and the Atmore State Technical College and its president. Shuford charged that the defendants had violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17; 42 U.S.C.A. § 1981; the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983; and § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. He invoked the jurisdiction of the court based on 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3). By amended complaint, Shuford sought to represent all African–Americans denied employment in or promotion to presidential, faculty, administrative, or supervisory positions in the postsecondary system. The court subsequently permitted four women to intervene as plaintiffs in this lawsuit to raise claims of sex discrimination in employment in the postsecondary system on behalf of female professional educators.

Shuford and the defendants have submitted to the court a proposed partial consent decree which would resolve the race-based claims against the postsecondary system. This cause is currently before the court on their joint motion for approval of this proposed compromise and settlement. After reviewing the decree and after considering all comments for and against it, the court has concluded that the decree should be approved.

### I.  BACKGROUND

Shuford has been employed by the State of Alabama's postsecondary educational system in excess of 20 years. The postsecondary system is comprised of 33 junior, technical, and community colleges across the state: junior colleges provide a general academic education; technical colleges provide an education in various trades; and community colleges combine both types of education. In his original complaint filed on February 24, 1989, Shuford alleged that he was denied several promotions at Atmore State Technical College on the basis of his race and was required to train the less-qualified white indi-

viduals who were appointed to those positions.[1] Shuford further alleged that, even when promoted to the position of coordinator of student services, he was not paid in accordance with his experience in the postsecondary system, resulting in underpayments of $5,000 per year.

In April 1989, Shuford filed an amended complaint in which he sought to represent a class of similarly situated African–Americans seeking relief against all institutions in the postsecondary system. The court certified the following class:

"A class of all Black citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree."[2]

Schedule A positions are presidents, B positions are administrators and managers, C positions are non-faculty professionals, and D positions are faculty members.

The Shuford class claims that the cause of the employment discrimination is that college presidents in the postsecondary system—the vast majority of whom have historically been white men—are given unbridled discretion in the hiring and promotion of personnel at their institutions.[3] Vacancies at many institutions are not advertised, are left open for extended periods of time, and are filled on a purely subjective basis without reliance on any objective minimum qualifications. The Shuford class alleged that, as a result of the lack of uniform, reviewable employment standards at most institutions, discrimination against African–American professionals was widespread, resulting in the underrepresentation of African–American employees throughout the A, B, C, and D job classes.

According to the Shuford class, the discretionary and discriminatory hiring and promotion practices violated provisions of court-ordered faculty and staff desegregation rulings in *Lee v. Macon County Bd. of Educ.*, 267 F.Supp. 458, 472–73, 489–90 (M.D.Ala. 1967) (three-judge court) (per curiam) (affirmative duty to desegregate faculties and staffs), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967), in *Lee v. Macon County Bd. of Educ.*, 317 F.Supp. 103, 109–110 (M.D.Ala. 1970) (three-judge court) (per curiam) (setting goal of 25% African–American faculty and staff employment at trade schools and junior colleges), *modified in unrelated part*, 453 F.2d 524 (5th Cir.1971), *remanded*, 468 F.2d 956 (5th Cir.1972), and in a 1975 consent decree in *Lee v. Macon County Bd. of Educ.*, C.A. No. 604–E (M.D.Ala. Aug. 4, 1975).[4] The 1975 consent decree specifically required, among other relief, the establishment of "uniform non-discriminatory written standards and procedures for evaluating applicants for faculty and staff positions at all state junior colleges and technical schools." *Id.* at 4. Although the *Lee v. Macon* orders and consent decree were intended to remedy "segregation" in the postsecondary system, as opposed to "discriminatory employment practices," the court recognized that the hiring and promotion of faculty and staff on a non-discriminatory basis was a necessary ingredient in disestablishing racially identifiable schools. *Lee v. Macon*, 267 F.Supp. at 472. Notwithstanding the provisions of the orders and decree, uniform employment

---

1. Atmore State has since merged with Jefferson Davis Community College.

2. The parties to the proposed consent decree stipulated to the certification of this class.

3. The testimony of the presidents of Bishop State and Atmore State Community Colleges supports the contention that presidents have autonomy in employment decisions at the individual institutions. *See* Kennedy Deposition, at 44–45 ("The president has the right, the authority, the responsibility to select ..."); McLeod Deposition, at 37–38 ("Primarily, personnel decisions are made at the institutional level").

4. The *Lee v. Macon* orders were dismissed in the Southern District of Alabama in 1982, but remain in effect in the Northern and Middle Districts. C.A. No. 5945–70–H (S.D.Ala. Jan. 20, 1982).

standards have not been adopted in the post-secondary system and little progress has been made toward faculty and staff desegregation. For example, between the period of 1980 and 1993, the percentage of African–American faculty members in the postsecondary system only increased from 18% to 19%.

The court granted motions to intervene by Connie Johnson and Karen Newton on June 12, 1991, and October 19, 1993, respectively. Johnson and Newton have raised claims of sex-based employment discrimination stemming from the same standardless employment practices at many of the institutions in the postsecondary system. On October 22, 1993, this court certified a class of women to be represented by Johnson and Newton. On March 2, 1994, the court permitted Myra P. Davis and Sheryl B. Threatt, two African–American women, to intervene in this action. Davis and Threatt seek to represent an overlapping class of African–American female professionals employed in the postsecondary system. Their motion for class certification, filed on March 3, 1994, is pending before the court. The claims of these women have not been resolved in the proposed partial decree currently under the court's consideration and are set for trial at a later time.[5]

Shuford and the defendants engaged in discovery until the proposed settlement was reached in November 1993.[6] On November 19, 1993, they filed a joint stipulation for class certification and a motion to approve the proposed partial consent decree. On the same date, the court entered an order certifying the class; tentatively approving the decree, subject to notice and an opportunity for objections at a fairness hearing; approving the form of notice; and requiring the defendants to distribute notice to all employees in the state postsecondary system em-ployed in a position covered by the decree. Several written objections to the proposed decree were filed by non-class-member employees in advance of two fairness hearings scheduled by the court.[7] At the fairness hearings, the Shuford class offered substantial testimonial and statistical evidence to support the relief embodied in the decree.

The outline of the consent decree is as follows. The Alabama State Board of Education must adopt a written equal employment and promotion policy for the postsecondary system declaring that "no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including without limitation race, sex, or age" and that, "to ensure this policy is effectuated in a manner which advances the purposes and goals of this decree, ... all persons participating in selection procedures for professional employees shall take all action necessary to foster Black persons having equal and effective participation in the personnel decision-making process." The decree sets the following numerical hiring goals. The decree treats presidents (schedule A) separately from other positions and establishes as a goal that .25% of all college presidents shall be African–American by the end of fall quarter 1996. The decree divides the remaining covered positions into three categories: schedules B and C1; schedules C2 and C3; and schedule D. For these three categories, the decree sets two types of goals, one addressing employment at each institution and the other addressing the postsecondary system as a whole. First, the decree sets a goal for each college that, by the end of fall quarter 1996, the percentage

---

5. On March 2, 1994, the court also permitted Kenneth A. Brackins, an African–American male, to intervene in this action. Brackins and Newton claim that they were denied the same job for discriminatory reasons.

6. A proposed settlement was agreed upon in December 1992, but rejected by the Alabama State Board of Education in January 1993. Discovery resumed and the parties again began to discuss settlement in April 1993.

7. Two types of objections were received. First, several persons objected to the race-conscious provisions of the proposed decree; these objections are addressed below. Second, objections were received from several women regarding the timing, but not the substance, of the relief embodied in the proposed decree; as explained below, these objections were resolved by agreement of the parties at the fairness hearings and have been withdrawn. See infra note 18.

of African–American employees in each of the three categories be equal to at least the number which represents 75% of the percentage of African–Americans in the primary service area of the college. Second, the decree sets sequential goals for the percentage of African–Americans employed system-wide in each of the three categories of positions: 21% by the end of fall quarter 1995; 23% by the end of fall quarter 1997; and 25% by the end of fall quarter 1999. It is important that the goals address both the institutions and the system as a whole because, without targets for each institution, historically African–American institutions would "round-up" the system-wide average allowing historically white institutions to ignore the problem. With the inclusion of institutional-level goals, individual presidents can be held accountable. The goals, however, are not to be construed as quotas and do not require any college to hire an African–American who is not qualified for the position in question.

The decree would also establish a statewide bank of African–American applicants and require the chancellor to employ various recruiting techniques to identify and attract qualified African–Americans. College presidents are required to obtain the names of all relevant applicants from the statewide bank when a vacancy arises, and all vacancies must be advertised. Written job descriptions, containing objective selection criteria, are required. A written evaluation must be prepared for each applicant, and all applicants with the relevant objective qualifications must be interviewed.[8] Each college president must appoint a recruitment and selection committee—whose membership shall be at least 40% African–American—to screen and recommend applicants, and the college president must justify his or her decision in writing. A college president may reopen the selection process if he or she deems it necessary to comply with the goals of the decree.[9] Other provisions in the decree require college presidents to follow certain procedures when making lateral transfers, hiring temporary employees, and making lay-offs to ensure that such practices are not used to thwart the goals of the decree. The decree also requires detailed reporting so that counsel for the Shuford class may monitor compliance.

The proposed decree includes individual relief for Shuford, who is to be appointed Dean of Extended Services at Jefferson Davis Community College and receive $45,000 in compensatory damages. Under the terms of the proposed decree, the court will retain jurisdiction over systemic relief in the decree for seven years. The decree will also dismiss, with prejudice, Shuford's claims against the individual defendants in their individual capacities and the claims under § 2 of the Voting Rights Act of 1965 against all defendants. The parties to the decree have also represented to the court that they would cooperate in the dismissal of the *Lee v. Macon* orders to the extent that they overlap with the partial decree in this case.

## II.  DISCUSSION

In *Paradise v. Wells*, 686 F.Supp. 1442, 1444–46 (M.D.Ala.1988) (Thompson, J.), this court explained the standards which a court must apply in deciding whether to approve a consent decree. It is well established that voluntary settlement is the preferred means of resolving class action employment discrimination cases. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).[10] It is equally well established, however, that the settlement process is more susceptible than the

---

**8.** Screening of applications is permitted where there are more than ten qualified applicants.

**9.** A provision in the original version of the decree would have also given college presidents the unlimited authority to go outside the selection process at any time to employ an African–American. After the court expressed concern about this provision at one of the fairness hearings, the parties submitted a revised decree on February 16, 1994, that does not include this provision, and it is this revised decree that is currently under the court's consideration.

**10.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

adversarial process to certain types of abuse and, as a result, a court has a heavy, independent duty to ensure that the settlement is "fair, adequate, and reasonable." *Pettway,* 576 F.2d at 1169. For example, the interests of the class lawyer and the class may diverge, or a majority of the class may wrongfully compromise, betray or "sellout" the interests of a minority. *Id.* A court also has a duty to ensure that the settlement is not illegal or against public policy. *United States v. Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980); *Harris v. Graddick,* 615 F.Supp. 239, 242 (M.D.Ala.1985) (Thompson, J.).

### A. *Whether the Decree is Fair, Adequate, and Reasonable*

■ In determining whether a settlement is fair, adequate, and reasonable, the obvious first place a court should look is to the views of the class itself. Because the views of the class are so critical, the court must first ensure that the requirement of Rule 23(e) of the Federal Rules of Civil Procedure—that notice of the proposed decree be sent to all class members—has been satisfied. In this case, court-approved notices were distributed individually to all present employees, both class and non-class members, of the 33 institutions in the postsecondary system who occupy positions covered by the proposed partial consent decree. Notices were also posted in conspicuous places at each institution and addressed generally to all African–Americans who are, have been, or may become candidates for employment in or promotion to the covered positions.[11] The notices described the proposed partial decree, advised recipients that their employment and promotion opportunities might be affected, and included specific information about how to present objections in writing and at the fairness hearings. A fairness hearing was held on December 20, 1993, and a supplemental fairness hearing was held on January 19, 1994, to seek the views of both class and non-class members.[12] The court concludes as a threshold matter that the notice and fairness hearings were adequate to inform the class about the provisions of the proposed partial decree and to solicit and determine their views.[13]

The court cannot escape the conclusion that the class is overwhelmingly in support of the proposed partial decree. Of the large number of class members who received notice, only three made their objections known to the court, and these objections were subsequently withdrawn. These three objections came from African–American women who, along with other members of the class of women, opposed the date of implementation of the decree, but did not in any way oppose the extent or nature of the relief embodied in the decree. The women argued that the immediate implementation of the decree would allow the defendants to fill vacant positions with men and thereby prejudice the ability of women to obtain access to these same positions should they be successful at trial. Upon agreement by all parties to a procedure to protect the rights of the women should they prevail on their claims,

---

**11.** Exhaustive documentation of compliance with the court's notice requirements was presented at the fairness hearing on December 20, 1993.

**12.** Two of the 33 institutions—Trenholm State Technical College and Alabama Southern Community College—received the notices too late to give their employees sufficient time to file objections before the fairness hearing held on December 20, 1993. A revised notice was sent to these institutions and sufficient time was allotted for objections to be filed. The supplemental fairness hearing was held to seek their views on February 19, 1994. No objections were filed from these institutions and none was raised at the supplemental hearing.

**13.** As stated, notices were also sent to non-class-member employees. The Civil Rights Act of 1991 precludes challenges to a consent judgment resolving employment discrimination claims from those non-class members who had actual notice of the proposed decree and a reasonable opportunity to present objections. 42 U.S.C.A. § 2000e–2(n)(1)(B). The notices and fairness hearings were sufficient under the 1991 Act. Non-class-member employees in the positions covered by the decree were made aware that the decree might adversely affect their interests and were invited to respond in writing and at the two fairness hearings. As discussed below, the court has carefully considered the opinions of those who made their objections known and has overruled these objections. In addition, as a corollary to the requirements of § 2000e–2(n)(1)(B), the court has provided these objectors with notice of this order as well.

these objections were withdrawn.[14] In any case, other African–American women were present at the fairness hearing to speak in favor of the proposed decree.

Shuford testified that the proposed decree should protect all class members because it requires all institutions to adopt uniform, reviewable employment procedures for the hiring and promotion of all professional personnel. Shuford believes that such an objective selection process will be effective in reducing the underrepresentation of African–Americans in professional positions in the postsecondary system. The court is also impressed by the testimony of Dr. Yvonne Kennedy, president of Bishop State Community College, a member of the Shuford class who served on a committee of presidents of post-secondary institutions formed during settlement discussions to make recommendations regarding provisions of the consent decree. Kennedy testified on the basis of her work on the committee and experience in the postsecondary system that the proposed decree, with proper monitoring, should be very valuable in opening up opportunities to members of the class. Kennedy believes that recruitment at historically African–American colleges, as required by the decree, should increase the pool of qualified African–American applicants and remove the obstacle mentioned by certain presidents of being unable to locate qualified African–Americans. She further testified that the objective application process called for by the decree, with system-wide controls, will help to bring an end to the current system of purely subjective decisionmaking and help to prevent individu-

al presidents from making any employment decisions on the basis of race.

In addressing whether a settlement is fair, adequate, and reasonable a court should also consider the judgment of experienced counsel for the class. *Pettway,* 576 F.2d at 1215. Counsel for the Shuford class have argued forcefully to the court that the proposed decree is fair, adequate, and reasonable. Class counsel have been intimately involved with the issues in this case since 1989 and spent many months negotiating the proposed decree with the defendants; their views are taken seriously by this court.[15] During discovery, counsel for the Shuford class obtained and analyzed statistical employment data (name, race, sex, and salary of all employees in the postsecondary system), reports required by the *Lee v. Macon* decree, personnel manuals, personnel records, depositions of defendant college presidents, and minutes of meetings of the Alabama State Board of Education. Class counsel, therefore, conducted sufficient discovery and investigation to enable them to act intelligently in negotiating the terms of the proposed decree and in recommending its approval to the court.

The court also takes seriously the views of Solomon Seay, Jr., counsel for the National Education Association (NEA) in the *Lee v. Macon* litigation and highly respected as one of the best civil rights attorneys in the nation. Although not serving as class counsel in this case, Seay has monitored the faculty and staff hiring in the postsecondary system for well over 20 years in his role as counsel in *Lee v. Macon.* Seay testified that the pro-

---

**14.** The parties agreed in the interim that, if positions covered by the partial decree are filled by promotion, new hire, or lateral transfer before the time the court hears evidence on and rules on the claims raised by the women, the persons so employed will be notified in writing that their employment is subject to the condition that the court may at a later time require that the position be reopened if necessary to provide relief to the class of women—should the court conclude after hearing the evidence that such relief is necessary. Persons hired, transferred, or promoted will specifically be notified that they should not alter their "lifestyle" in reliance on the new position because there exists the possibility that they will be "bumped" from the new position. *Hicks v. Dothan City Bd. of Educ.,* 814 F.Supp. 1044 (M.D.Ala.1993) (Thompson, J.)

(similar interim arrangement ordered by court). The defendants agreed to inform counsel for the women when covered positions are filled and who was considered for those positions. In agreeing to this arrangement, defendants did not concede that the women would be able to make the necessary showing of likelihood of success on the merits as would be required for preliminary injunctive relief.

**15.** Although the court must be sensitive to potential conflict between the class and its attorneys, *Pettway,* 576 F.2d at 1215, no one has suggested the presence of such conflict or questioned in any manner counsel's dedication to the Shuford class.

posed decree is a substantial improvement over the 1975 consent decree in *Lee v. Macon* because it more specifically categorizes levels of employment, has more ambitious recruitment provisions, and calls for more careful supervision and control. He concluded that the decree promises to be of great benefit to class members.

The court has no reason to suspect that the proposed decree treats any portion of the class unfairly, especially in light of the dearth of objections filed by class members.[16] There appears to be no overt conflict within the class. Although the proposed decree provides monetary damages only to Shuford, it does not preclude or in any way limit individual suits by other class members for damages against the defendants. The overall impact of the proposed decree will be systemic relief in each of the professional job classes and at each institution. There is no delineation among class members as to the applicability of any provision contained in the proposed decree. As this court wrote in *Paradise*, "where the settlement provides for structural changes with each class member's interest in the adequacy of the change being substantially the same, and where there are no conflicts of interests among class members or among definable groups within the class, then the decision to approve the settlement 'may appropriately be described as an intrinsically 'class' decision in which majority sentiments should be given *great weight.*'" 686 F.Supp. at 1445 (quoting *Pettway*, 576 F.2d at 1217) (emphasis in original).

With the above considerations in mind, the court should also independently assess whether the partial consent decree is fair, adequate, and reasonable. The court agrees with counsel for the Shuford class that the proposed partial decree should be a significant benefit to class members. The decree establishes standardized application and selection procedures to ensure that all applicants are considered on the basis of their qualifications. Under the terms of the decree, membership on recruitment and selection committees at each institution will be 40% African–American; such representation on this committee is likely to ensure fair consideration of African–American applicants. The decree requires affirmative recruitment of qualified African–Americans so that African–Americans are well-represented in the applicant pool. The decree further requires that the names of qualified African–Americans be maintained in a statewide data bank and that institution presidents consider relevant applications whenever a vacancy arises. Furthermore, presidents must justify their employment decisions by written explanation. The court is also impressed that the decree seeks to be exhaustive in closing possible loopholes to the effective implementation of the employment goals by specifically addressing the areas of temporary hiring, transfers, mergers, and consolidations. These provisions will ensure that the specific hiring and promotional goals of the decree will not be undermined by the abuse of certain "secondary" employment practices such as transfers and the use of temporary workers. In light of the above considerations, the court must conclude that the proposed partial consent decree is, at a minimum, fair, adequate, and reasonable.

### B. *Whether the Decree is Legal*

The court must also address whether the partial consent decree is legal. Five non-class-member employees of the postsecondary system have filed objections, contending that, because of the presence of race-conscious relief, it is not.[17] The court cannot agree with these objectors and concludes upon its own review that the race-conscious relief in the proposed decree is not illegal.

The objectors argued that the proposed decree constitutes "reverse discrimination" against non-African-Americans. Specifically, the objectors opposed: (1) the goals for employment of African–Americans in the covered positions, which they termed "quotas";

---

16. *Cf. Reynolds v. King*, 790 F.Supp. 1101, 1110 (M.D.Ala.1990) (majority of class members oppose the decree and "only the attorneys and a few class members really want the decree").

17. These five objections are in addition to the three objections by women already addressed by the court. The five objections were filed by George W. Terrell, Jr., Dwight S. Walls, Jerry D. Stone, Julia Wells Ford, and John D. Wilcox.

(2) the 40% African–American membership on the recruitment and selection committee at each college; (3) the affirmative recruitment of qualified African–American applicants; (4) the use of a statewide information bank of qualified African–American applicants; and (5) the requirement that a president justify in writing his or her decision not to select an African–American employee who applies for a lateral transfer.[18]

The court must determine whether the race-conscious provisions of the proposed decree are legal under both Title VII and the equal protection clause of the fourteenth amendment. Under the equal protection clause, this court must apply "strict scrutiny" to race-conscious relief voluntarily implemented by a public employer, irrespective of whether the relief is embodied in merely personnel procedures or in a consent decree. *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 503, 506, 109 S.Ct. 706, 727, 728, 102 L.Ed.2d 854 (1989) (majority opinion applies strict scrutiny); *see also Peightal v. Metro. Dade County,* 940 F.2d 1394, 1399 (11th Cir.1991) ("In *Croson,* a majority of the Court finally agreed that the constitutionality of [race-conscious relief] must satisfy a strict scrutiny standard"); *H.K. Porter Co. v. Metro. Dade County,* 975 F.2d 762, 764 (11th Cir.1992) ("if a state or local government has developed a minority set-aside, a court must strictly scrutinize the program"), *vacated,* 998 F.2d 892 (1993) (opinion vacated upon motion of parties after settlement).[19] The same standard, however, does not apply to race-conscious relief under Title VII. *Johnson v. Transportation Agency,* 480 U.S. 616, 627 n. 6, 632, 107 S.Ct. 1442, 1449 n. 6, 1452, 94 L.Ed.2d 615 (1987); *Peightal,* 940 F.2d at 1412–13 n. 2 (Tjoflat, J., dissenting). The standard under Title VII is instead whether the race-conscious relief was designed to "eliminate manifest racial imbalances in traditionally segregated job categories." *Johnson,* 480 U.S. at 628, 107 S.Ct. at 1450 (quoting *Steelworkers v. Weber,* 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979)). Because strict scrutiny is the "more restrictive" standard and because the court concludes that the proposed decree passes strict-scrutiny analysis, the court need not analyze the decree separately under the standard of Title VII. *Johnson,* 480 U.S. at 630 n. 8, 107 S.Ct. at 1451 n. 8.

This court now applies strict-scrutiny analysis to the proposed decree. The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson,* 488 U.S. at 493, 109 S.Ct. at 721. Thus, there are two prongs to the strict scrutiny analysis: first, "any racial classifications 'must be justified by a compelling governmental interest,'" and, second, "the means chosen by the State to effectuate its purpose must be 'narrowly tailored to the achievement of that goal.'" *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 285, 106 S.Ct. 1842, 1852, 90 L.Ed.2d 260 (1986) (plurality opinion) (citations omitted). *See also Croson,* 488 U.S. at 503, 506, 109 S.Ct. at 727, 728 (majority opinion); *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion).[20] Importantly, the Supreme Court has indicat-

---

**18.** Two objectors also objected to a provision of the original version of the decree which would have given college presidents the unlimited authority to go outside the selection process at any time to employ an African–American. Because the parties have voluntarily agreed to remove this provision from the decree, the court will not consider the objections to this provision. *See supra* note 7.

**19.** Although *Croson* involved the race-conscious provisions of a voluntarily-adopted local plan, it seems clear that strict scrutiny also applies to race-conscious provisions in consent decrees. *See In re Birmingham Reverse Discrimination*

*Employment Litigation,* 833 F.2d 1492, 1501 (11th Cir.1987) ("we reject any notion that the memorialization of that voluntary undertaking in the form of a consent decree somehow provides the employer with extra protection against charges of illegal discrimination").

**20.** *Cf. Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2825, 125 L.Ed.2d 511 (1993) ("the Fourteenth Amendment requires state legislation that expressly distinguishes among citizens because of their race to be narrowly tailored to further a compelling governmental interest").

ed that the government "unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *Id.* *See also Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 ("showing of prior discrimination by the governmental unit involved" justifies race-consciousness). The race-conscious relief before the court, therefore, is "lawful if it represents a 'narrowly tailored' effort to remedy past . . . discrimination against" African–Americans in Alabama's postsecondary educational system. *Stuart v. Roache,* 951 F.2d 446, 449 (1st Cir.1991).

### 1. Compelling State Interest

■ Whether race-conscious relief serves a remedial purpose with respect to past discrimination is an evidentiary issue. The court need not make "formal findings" of discrimination; rather, there must be a "strong basis in evidence" for the conclusion that the decree remedies past discrimination. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1849); *see also Stuart,* 951 F.2d at 450. The requisite evidentiary basis has also been described as "a prima facie case of a constitutional or statutory violation." *Croson,* 488 U.S. at 500, 109 S.Ct. at 72. *See also Brunet v. City of Columbus,* 1 F.3d 390, 406 (6th Cir.1993) (prima facie case sufficient); *Stuart,* 951 F.2d at 450 (same).[21] Therefore, "less evidence is necessary to justify an affirmative action plan than is necessary to prevail on an individual class action claim of intentional discrimination." *Brunet,* 1 F.3d at 406. Societal discrimination alone, however, is not a sufficient justification for race-conscious relief; there must be "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847 (plurality).

■ In determining whether the requisite evidentiary basis for race-conscious relief exists, the court must therefore decide. if there is sufficient evidence to establish a prima facie case of racial discrimination. The Shuford class alleges a pattern and practice of intentional disparate treatment of African–Americans seeking employment or promotion in the postsecondary system. To prove a system-wide pattern or practice of discrimination, an employee must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," but rather must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977). The Eleventh Circuit has noted that "great uncertainty exists as to the precise elements of [a] prima facie case" of class-wide disparate treatment, *Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983); "the neat pattern of shifting inferences provided by *McDonnell Douglas* [*Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973),] is not directly applicable to class actions." *Id.* Courts, therefore, avoid any "structural analysis" and consider "the evidence as a whole to determine whether the plaintiff class has established 'by a preponderance of the evidence that . . . discrimination was the [defendants'] standard operating procedure.'" *Id.* (quoting *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855); *see also Griffin v. Carlin,* 755 F.2d 1516, 1525 (11th Cir.1985). A prima facie case of class-wide disparate treatment is typically established by a combination of statistics and anecdotal evidence. *Griffin,* 755 F.2d at 1525; *Perryman,* 698 F.2d at 1143–44.

---

**21.** In his dissenting opinion in *Peightal,* Judge Brown wrote that the evidence of past discrimination need only "approach" a prima facie case, 940 F.2d at 1404, apparently relying on Justice O'Connor's statement in *Croson* that there was "nothing approaching a prima facie case" of discrimination in the Richmond construction industry. 488 U.S. at 500, 109 S.Ct. at 725. The court doubts that the majority opinion authored by Justice O'Connor intended to establish "approaching a prima facie case" as the appropriate standard and is thus reluctant to apply that standard as urged by the Shuford class. In any event, because the court finds that the evidence presented by the Shuford class not only approaches but establishes a prima facie case, the court need not resolve this issue.

In this case, the Shuford class has offered evidence of: historical discrimination by the defendants, as chronicled through the history of the litigation in *Lee v. Macon;* anecdotal instances of intentional discrimination against Shuford and other African–Americans in employment, promotions, and salaries; and the underrepresentation of African–Americans in the covered positions as demonstrated by statistical data. The court reviews this evidence below and finds that it provides a strong basis to show racial discrimination in employment in the postsecondary system, and establishes a prima facie case of such discrimination.[22]

### a. *Historical Evidence*

Although evidence of historical discrimination by the defendants may not be sufficient by itself to justify race-conscious relief, it is fully appropriate to consider such historical evidence, especially where the historical discrimination has yet to be remedied. *See, e.g., Brunet,* 1 F.3d at 408–09. This court has made ample findings relating to the segregation of faculty and staff in Alabama's public system of education, including the postsecondary system, throughout the *Lee v. Macon* litigation; appallingly, little or no progress has been made. The court takes judicial notice of these extensive findings, and reviews them only briefly here.[23]

In 1967, this court wrote that the Alabama State Board of Education and others have "endeavored to thwart and, with considerable success, have thwarted efforts toward implementation of the constitutional requirement to eliminate faculty and staff segregation in the public school system of Alabama." *Lee v. Macon,* 267 F.Supp. at 473. In order to eliminate racially identifiable faculties and staffs, the court ordered that "Race or color

will not be a factor in the hiring assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members ... except that race will be taken into account for the purpose of correcting the effect of the past segregated assignment of teachers in the dual system." *Id.* at 489. The State Board of Education was ordered to direct postsecondary institutions to "recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each" postsecondary institution by September 1967. *Id.* at 484.

In 1970, after making findings regarding the continued segregation of faculty, staff, and students in the postsecondary system, the court ordered further relief. The court today is struck by the similarity of the goals of the 1970 order and the proposed decree currently under consideration and saddened by the ongoing need for essentially the same relief. The court in 1970 ordered that the defendants:

"assign the teaching staff and other staff members so that the ratio of Negro to white teachers and other staff members in each of the junior colleges and trade schools in the State of Alabama is substantially the same as such ratio is for the Negro and white population in the State of Alabama. This means that, effective September 1971, a minimum of 25 percent of the teachers and other staff members at each junior college and trade school will be Negroes."

*Lee v. Macon,* 317 F.Supp. at 109. The court further ordered that dismissals must be made "on the basis of objective and reasonable nondiscriminatory standards" and that resulting vacancies must be filled by a person of the same race as the person dismissed. *Id.* at 109–10. Finally, the court ordered

---

22. Although the consent decree contains a disclaimer of liability by the defendants, the disclaimer does not preclude the court's consideration of evidence of past discrimination introduced in the action. *Howard v. McLucas,* 871 F.2d 1000, 1007–08 (11th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989); *see also Stuart,* 951 F.2d at 453 (collecting cases).

23. The court also takes judicial notice of relevant findings relating to the 1967 *Lee v. Macon* order

and to the low number of African–American faculty employed at Calhoun State Community College and Athens State College made in *Knight v. Alabama,* 787 F.Supp. 1030, 1105, 1185–85 (N.D.Ala.1991), *aff'd in part, rev'd in part, vacated in part,* 14 F.3d 1534 (11th Cir.1994) (leaving relevant factual determinations of district court untouched). For example, the *Knight* court found that Athens State had 7.5% African–American faculty in 1983, but only 6.1% in 1990.

direct exchange of faculty members between Jefferson State Junior College and Wenonah State Junior College, and between Mobile State Junior College (now Bishop State) and James H. Faulkner Junior College. *Id.* at 111.

Dr. Yvonne Kennedy, now president of Bishop State, participated in the exchange program in 1970 between Bishop State, historically African–American, and Faulkner Junior, historically white. She described the atmosphere at Faulkner Junior as "extremely hostile." African–American teachers transferred to Faulkner Junior were told to eat lunch in their classrooms as opposed to in the cafeteria; it was the institution's policy that the African–American professors were "not going to be seen mixing." She testified that Faulkner Junior sent its least qualified teachers to Bishop State. Kennedy did not stay at Faulkner Junior more than an academic quarter, and she believed that the exchange failed within a year. She further reported that new hirees at Bishop State were white, in compliance with the *Lee v. Macon* order, but that Faulkner Junior continued to hire whites almost exclusively; those African–Americans hired at Faulkner Junior did not receive tenure.

"No substantial progress" was made in faculty and staff desegregation between 1970 and 1975. In 1975, NEA, as plaintiff-intervenor in *Lee v. Macon,* filed a motion for further relief alleging that "the defendants have failed to promulgate and utilize objective and reasonable non-discriminatory criteria to be applied to personnel actions throughout the entire state junior college and technical school system since the amended August 14, 1970 desegregation Order." *Lee v. Macon,* C.A. No. 604–E (Aug. 4, 1975), at 1. This aspect of NEA's 1975 motion is almost identical to the allegations of the Shuford class. Under the terms of the 1975 consent decree settling NEA's motion for further relief, the defendants agreed, among

other provisions, to engage in specified affirmative recruitment measures; adopt uniform, non-discriminatory written standards and procedures for hiring, promotion, transfers, and dismissal of faculty and staff; and maintain written records of employment transactions.

The historical evidence is significant to the court for two reasons. First, as stated earlier, although *Lee v. Macon* was a desegregation case as opposed to an employment discrimination case, it is abundantly clear from the historical evidence that the two forms of discrimination are overlapping and reinforcing. That is, the segregation of faculty, staff, and students in the postsecondary system was accomplished and perpetuated in large part by racial discrimination in employment. Although the findings in *Lee v. Macon* are perhaps too distant to serve alone as a compelling state purpose in 1994, the insubstantial progress toward the goals of the orders and consent decree after 27 years (as shown by the statistics reviewed below) leads the court to conclude that the discrimination is ongoing into the present; in other words, the discrimination is living, and not merely historical.[24]

The court finds the historical evidence to be significant for a second reason: it shows a pattern of intransigence on the part of the state defendants who have refused to implement the *Lee v. Macon* orders and decree effectively. The decree, in the words of the Supreme Court, is "supported not only by the governmental interest in eradicating [the defendants'] discriminatory practices, it is also supported by the societal interest in compliance with the judgments of federal courts." *Paradise,* 480 U.S. at 170, 107 S.Ct. at 1066 (quoting *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 485, 106 S.Ct. 3019, 3055, 92 L.Ed.2d 344 (1986) (Powell, J., concurring in part and concurring in judgment)). As in *Paradise,* defendants in this case have

**24.** The Supreme Court and Eleventh Circuit have recognized in the school desegregation context that the establishment of "racially neutral policies not animated by a discriminatory purpose" is insufficient to eliminate the present effects of past discrimination. *Knight v. State of Alabama,* 14 F.3d 1534, 1540 (11th Cir.1994) (quoting *United States v. Fordice,* — U.S. ——, ——, 112

S.Ct. 2727, 2737, 120 L.Ed.2d 575 (1992)). In this case, the defendants have not even adopted uniform and objective employment standards; they certainly have not dismantled "root and branch" the lingering effects of the past de jure system of segregation, which included the segregation of both faculty and administrative staff. *Id.*

resisted the implementation of both court-ordered and court-approved relief; as shown by the deposition testimony, defendants have failed to implement uniform, objective criteria in their employment practices. Their resistance provides an additional basis to conclude that the race-conscious provisions of the decree serve a compelling purpose.

### b. Anecdotal Evidence

"In most class actions alleging employment discrimination, a vital part of the plaintiffs' case is evidence that individual class members, particularly the named plaintiffs, were illegally discriminated against in various facets of the employment process." *Perryman*, 698 F.2d at 1143. Evidence that class members have been the victims of individual acts of discrimination can provide "substantial, and perhaps determinative" support for a pattern or practice of discrimination. *Id.* The Shuford class has presented evidence of several acts of discrimination, and the court determines that this evidence establishes a prima facie case of discrimination against individual class members.

Although the *McDonnell Douglas* factors, used to analyze whether an individual plaintiff has established a prima facie case of employment discrimination, are not applicable in determining whether the Shuford class has established its prima facie case of class-wide discrimination, the court's consideration of the anecdotal evidence of individual discrimination is guided by these factors. An individual's prima facie case is established if the plaintiff shows that he or she belongs to a protected group; applied for and was qualified for a job for which the employer was seeking applicants; was rejected despite his or her qualifications; and after the rejection, the position remained open or was filled by a person with equal or lesser qualifications who is not a member of the protected class.[25] *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

The evidence reflects that Shuford and other African–Americans were discriminated against in employment because of their race.[26] Shuford has been employed in the postsecondary system since 1969. He received his B.S. degree in counseling and vocational agriculture from Alabama A & M University in 1969 and his master's degree from Alabama State University in 1978. He also received certification in vocational technical education from Auburn University. In 1969, Shuford began his employment with Atmore State Technical College. In 1974, Governor George C. Wallace appointed C.P. Floyd, a white male, as a coordinator at Atmore State. Floyd had no knowledge of the position and was trained by Shuford for six months. In 1975, the State Board of Education appointed Malcolm Jones as president of Atmore State; within one year, Floyd was promoted to dean of instruction. The dean of instruction position was not advertised. Shuford applied for the coordinator position vacated by Floyd, but was told by Jones that the position would not be filled.

Subsequently, Shuford was required to orient Curtis Fayard, a white male, into the student services department. After receiving training from Shuford, Fayard was promoted to the coordinator's position left open by Floyd and which Shuford was told would not be filled. The position was not advertised and Shuford learned of Fayard's pro-

---

**25.** Although, as discussed below, it is not possible to establish what were the specific qualifications for the covered positions, the evidence does show that the African–American applicants were *more* qualified than the white persons hired. On the basis of this evidence, the court assumes that the African–Americans who applied were, at the very least, qualified within the meaning of *McDonnell Douglas*.

**26.** Defendant Malcolm Jones, president of the college where Shuford was employed and a signatory of the proposed decree, has objected to this court making any findings of fact that he was involved in discrimination against Shuford. The

court finds Jones's objection to be without merit. As stated earlier, before approving the race-conscious provisions of the proposed decree, the court must determine if there is a strong basis in evidence to show past discrimination by the defendants, *see supra* note 22, and a portion of this evidence involves Jones. The court, however, is not making a finding of liability against Jones, but only concluding that the Shuford class's allegations establish a prima facie case. Jones's denial of liability in the proposed decree and to the court in his affidavit is not superseded by the court's consideration of the Shuford class's allegations against him. *Id.*

motion only when it was announced by Jones at a faculty meeting.

After Shuford filed a grievance with the Alabama Education Association, Jones called Shuford into his office and told him he would promote him to a coordinator position as well. At the time Shuford received the position, he had twelve years experience. Notwithstanding Shuford's experience, Jones placed Shuford on the C-salary schedule for a coordinator with six years of experience, and Shuford received the same pay as Fayard despite his additional experience. Shuford would have earned $5,000 more annually had he been properly placed on the salary schedule.

The positions of dean of students and dean of instruction remained vacant at Atmore State for more than ten years. In the early 1980s, instead of filling the positions, Jones hired Al Baggett, a white male with a B.A. degree in accounting, and announced at a faculty meeting that Baggett would serve as business manager, dean of students, and dean of instruction. Baggett had no experience in secondary or postsecondary education.

In 1985, Baggett resigned and Will Chapman, a white male, was hired as business manager. Chapman had a B.A. degree in accounting and no previous experience in secondary or postsecondary education. Prior to being hired at Atmore State, Chapman was employed in a family-owned hardware store. Again, Jones announced at a faculty meeting that Chapman would be business manager, dean of students, and dean of instruction. Shuford had applied for these positions repeatedly and was told each time that the positions would not be filled.

In 1988, Tommie Booth, a white male who was president of Brewer State Junior College, was asked to resign by Chancellor Gainous. A short time later, Jones hired Booth as a grant writer. Again, the position was not advertised; instead, Jones announced at a faculty meeting that the position of grant writer had been created and filled.

The evidence further reflected that on several occasions African–Americans were terminated at the end of one school year ostensibly due to a lack of funding. When funds became available, however, white employees were hired into the same positions. For example, John Allen and Ernest Marvin, African–American males, were hired as adult basic education instructors; they were released after one year of employment due to an alleged lack of funding and replaced by white males when funds became available. Bobby Allen, an African–American male who graduated from Carver Technical College, was hired as a barbering instructor, but released after one year. When funds became available, Jones hired a white male who was a self-taught barber. Allen owned and operated a barbering business at the time the white male was hired to fill the position from which he was terminated. There was also individual discrimination at institutions other than Atmore State. For example, Ulysses McBride, an African–American male with a Ph.D. who was a faculty member at Faulkner Junior, applied for the presidency at Faulkner Junior; Gary Branch, a white male with only a master's degree, was hired instead.[27]

The above instances establish a prima facie case of discrimination against individual class members. This evidence is probative not only of individual discrimination, but also contributes to Shuford's "strong basis in evidence" of class-wide disparate treatment. These individual instances illuminate both the historical evidence and statistical evidence submitted by the plaintiff class.

### c. *Statistical Evidence*

In *Croson,* the Supreme Court held that a statistical comparison between the employer's work force and the composition of the relevant labor pool is probative of a pattern of discrimination. The Court acknowledged that "gross statistical disparities" may alone prove a prima facie case of discrimination, but held that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities

---

27. After the Shuford litigation was filed, McBride was appointed president of Reid State

Technical College.

qualified to undertake the particular task." 488 U.S. at 501, 109 S.Ct. at 725–26.[28]

The covered positions in the decree—presidents, administrators, faculty members—require special qualifications, at least to some degree.[29] The parties to the decree have presented statistics of African–American employment levels in the covered positions, but are unable to provide a basis from which to make the relevant statistical comparison required by *Croson.* However, the Shuford class cannot be faulted for this failure; there is no available evidence from which it could establish the percentage of African–Americans in the Alabama workforce who were "qualified" to be employed in the covered positions. The failure is indigenous in cases such as this, where persons were being hired and promoted without regard to any objective measure of qualifications. That is, although some "special qualifications" were required—such that a statistical comparison with the general population remains inappropriate—it is impossible to discern what, if any, specific qualifications were required for employment in each of the covered positions. Because even the minimum qualifications cannot be identified, neither can the relevant labor pool. Admittedly, the covered positions do require a certain degree of education; but the defendants do not appear to have adhered to even these minimum educational requirements, such that the court cannot adopt as a proxy for the relevant labor pool the percentage of African–Americans in Alabama with a certain college or graduate-level degree.[30]

As a result, the defendants' conscious failure to establish cognizable and reviewable employment standards has not only violated prior court orders and fostered the defendants' racially discriminatory practices, it has had the further effect of frustrating the Shuford class's ability to establish the "gross statistical disparity" envisioned by *Croson.* It would be not only illogical but unfair that *Croson* could be used as a shield behind which a defendant who had engaged in an unlawful discriminatory practice could be relieved, because of the nature of the discriminatory practice, of having to provide full and effective relief. Surely, the *Croson* Court did not envision that its requirement for establishing gross-statistical-disparity would be turned on its head to serve as an absolute barrier to effective relief in cases where an employer had failed to follow identifiable minimum qualifications. Fortunately, a closer reading of *Croson* does not leave the Shuford class with such an unjust result.

It is therefore important to clarify what *Croson* did not hold. The Court in *Croson* did not hold that a statistical comparison between those employed and those in the qualified labor pool was *required* to establish a prima facie case of prior discrimination; rather, the Court held that only that type of comparison could be relied on exclusively. 488 U.S. at 501, 109 S.Ct. at 725–26. The Court did not shut the door to establishing the necessary "strong basis in evidence" by other means, both statistical and non-statistical.

In addition to the statistical comparison with the general population rejected by the Supreme Court, the district court in *Croson* had also relied on four other bases to show prior discrimination. The four other bases were: (1) that the race-conscious provisions in the ordinance professed to be "remedial"; (2) proponents of the set-aside for minority enterprises had expressed opinions that there had been discrimination; (3) few minority contractors belonged to contractors'

28. In *Croson,* the trial court improperly found that the race-consciousness was permissible because "minority businesses received .67% of prime contracts from the city while minorities constituted 50% of the city's population." 488 U.S. at 499, 109 S.Ct. at 724.

29. In *Hazelwood School Dist. v. United States,* 433 U.S. 299, 309 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977), the Supreme Court wrote that truck driver positions required no special qualifications because "the job skill there involved ... is one that many persons possess or can fairly readily acquire."

30. The covered positions also do not lend themselves to any other measure of minimum qualifications—for example, a license, successful completion of a course or examination, prior membership in a union or professional association, or possession of certain equipment—from which the Shuford class could ascertain a qualified labor pool.

associations; and (4) Congress had made national findings of discrimination in the construction industry. *Croson,* 488 U.S. at 499, 109 S.Ct. at 725. The Supreme Court concluded that these four bases of prior discrimination, viewed "singly or together," were too general and non-specific—that is, unsupported by specifically identifiable and provable facts—to provide a "strong basis in evidence" of prior discrimination. *Id.* at 499–500, 109 S.Ct. at 725. As to the first factor, the Court concluded that "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." *Id.* at 500, 109 S.Ct. at 725. As to the second factor, the Court refused to give weight to the "views" of certain proponents of the set-aside that there had been past discrimination and wrote that race does not become "a legitimate proxy for a particular condition merely by declaring that the condition exists." *Id.* at 501, 109 S.Ct. at 725. As to the third factor, the Court concluded that there are "numerous explanations for [the] dearth of minority participation [in contractors' associations], including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices." *Id.* at 503, 109 S.Ct. at 727. Finally, as to the fourth factor, the court found the nationwide findings of discrimination in the construction industry to be of little relevance because, in making such findings, "Congress was exercising its powers under § 5 of the Fourteenth Amendment...." *Id.* at 504, 109 S.Ct. at 727. "States and their subdivisions," however, "must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Id.*

Here, by contrast, in support of its prima facie case, the Shuford class has provided both anecdotal and historical evidence identifying in detail a substantial body of facts reflecting that racial discrimination in Alabama's postsecondary system is manifest, pervasive, and deeply intransigent; the dis-

trict court in *Croson* had no similarly reliable and detailed evidence of prior discrimination and certainly did not have the historical pattern of discrimination present here.[31] Therefore, even without statistical evidence, the Shuford class has more than met its burden under *Croson.*

Nevertheless, the Shuford class has presented statistical evidence, albeit different from that considered in *Croson,* which is probative of past discrimination. First, segregation persists among the faculties and professional staffs of the postsecondary institutions, resulting in gross underrepresentation of African–Americans at certain institutions. Based on 1993 figures, the faculties and professional staffs at many of the postsecondary institutions remain racially identifiable. For example, of 30 employees in covered positions at the Alabama Aviation Institute, only one is African–American. At Lawson State Community College, by contrast, of 81 employees in covered positions, only five are white. At the Hanceville campus of Wallace Community College, two African–Americans work with 138 whites in covered positions. At Wallace Community College in Dothan, eight African–Americans work with 128 whites in covered positions. Furthermore, according to the 1993 data, there are eight institutions that do not employ any African–Americans in the A, B, and C salary levels, and nine institutions that employ only one African–American. Ten institutions employ no African–Americans in the D salary level. System-wide, 48.8% of the African–Americans employed in the B and C salary levels are employed in five institutions; 54.9% of African–Americans employed in the D salary level are employed at the same five institutions.[32] The concentration of African–Americans at certain institutions, and their relative exclusion at other institutions, is probative of disparate treatment on the basis of race.

---

**31.** In *Cone Corp. v. Hillsborough County,* 908 F.2d 908, 915 (11th Cir.1990) (footnote omitted), the court held that a race-conscious plan survived summary judgment and noted that: "While some of the factors relied on ... are identical to those rejected in *Croson,* other factors are markedly different."

**32.** *See* 1993 Listing of A, B, C, and D Salaried Personnel at Alabama's Junior, Community and Technical Colleges, Exhibits 1 and 2 to Plaintiff's Brief in Support of Motion to Approve Partial Consent Decree.

The second conclusion the court may draw from the statistics is that there has been only minuscule progress in complying with the faculty and staff desegregation provisions of the *Lee v. Macon* decree. Such slow progress, when viewed in tandem with anecdotal evidence that whites were hired for positions over African–American applicants with better qualifications, is probative of class-wide disparate treatment. In 1970, the State Board of Education was instructed to achieve 25% African–American employment on faculties and staffs of the postsecondary institutions. Twenty-four years later, African–American employment in each of the salary schedules covered by the decree is significantly less than 25%. The statistics for African–American employment in 1993 are as follows: 15.1% of presidents, 17.8% of deans and business managers, 22.2% of non-faculty professionals, and 19.0% of faculty members. Reports filed by the defendants pursuant to the *Lee v. Macon* decree show how little progress has been made: in 1980, 18% of faculty members were African–American; by 1993, only 19% were African–American. This one-percent increase—only 32 additional African–American teachers system-wide over 13 years—is probative of the defendants' resistance and discriminatory employment practices.

Whether, in light of *Croson,* the court may rely exclusively on these employment statistics is an issue that need not be reached because of the substantial historical and anecdotal evidence provided. Together, the historical, anecdotal, and statistical evidence paints an expansive and detailed picture of racial discrimination from which the court cannot avert its eyes. The court therefore concludes that there is a "strong basis in evidence" of prior discrimination establishing a prima facie case of class-wide disparate treatment on the basis of race. This discrimination provides the necessary "compelling interest" to allow the defendants to employ race-conscious relief as a remedy.

The court now turns to the question of whether the specific race-conscious relief in the proposed partial decree is narrowly tailored to achieve that compelling remedial purpose.

### 2. *Narrowly Tailored*

In *Paradise,* the Supreme Court set forth several factors to determine whether race-conscious relief is narrowly tailored: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." 480 U.S. at 171, 107 S.Ct. at 1066 (citations omitted). The Court has recognized that "the choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.'" *Id.* at 184, 107 S.Ct. at 1073 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (Powell, J., concurring)).

#### a. *Necessity and Lack of Alternative Remedies*

The court must determine that the parties considered "the use of race-neutral means" to meet the remedial goals, *Croson,* 488 U.S. at 507, 109 S.Ct. at 729, and that they found the race-neutral options to be insufficient. *Paradise,* 480 U.S. at 172, 107 S.Ct. at 1053. The defendants' continued use of discriminatory, subjective, and non-uniform selection criteria, more than 20 years after such practices were enjoined, convinces the court that the relief embodied in the decree is necessary. Most of the remedies embodied in the decree—including the 25% goal—can be found in the history of the *Lee v. Macon* orders and decree. Throughout this history, defendants were under an obligation to employ race-neutral, objective selection criteria, and they have failed to comply. The proposed decree seeks to do little more than be effective and comprehensive in implementing the *Lee v. Macon* goals and remedies.

Importantly, the court also finds that "alternative remedies" have been not only tried without success for many years, but also that they are built in to the proposed decree. Although certain race-conscious relief comes into play immediately—for example, 40% African–American membership on the recruitment and selection committee, affirmative re-

cruiting—the "affirmative action" envisioned by the employment goals need not ever be employed.[33] The proposed decree is designed such that the goals of the decree will be achieved through intensified recruitment, the availability of qualified African–American candidates in the statewide bank, and the use of objective, race-neutral selection procedures and criteria. It is only when the goals are not reached by these means that any affirmative action would become necessary, and even then the decree only permits presidents to hire qualified African–American candidates. The use of race-neutral remedies in conjunction with goals has been found to increase narrow tailoring by maximizing the prospect for achieving the goals in whole or in part without any need for additional race-preferential relief. *Cone Corp v. Hillsborough County,* 908 F.2d 908, 916 n. 11 (11th Cir.1990); *Associated General Contractors, Inc. v. Coalition for Economic Equity,* 950 F.2d 1401, 1416–17 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). The proposed decree is narrowly tailored to allow race-neutral means to go as far as possible in reaching the goals before affirmative action is used, unlike the decrees approved in *Paradise* and *Howard v. McLucas,* 871 F.2d 1000, 1007–08 (11th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989), which required that separate race-conscious eligibility lists be prepared and used for every other vacancy that was filled. *See also Jansen v. Cincinnati,* 977 F.2d 238, 243 (6th Cir.1992) (approving use of "dual lists" in which 40% of vacancies are filled from "minority list" and 60% from "majority list"), *cert. denied,* —— U.S. ——, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993). In conclusion, the parties considered race-neutral means, employed race-neutral means in the past without success, and yet still reimpose race-neutral requirements as the frontline and principal means of achieving the goals in the proposed decree; in this context, *race-conscious relief is necessary and appropriate.*

### b. Flexibility and Duration of Relief

The proposed decree is both temporary and flexible. The decree has a duration of seven years, which may be extended for good cause by the court. Seven years is sufficiently temporary, in that it serves as a remedy for past discrimination and not as an attempt to maintain racial balance in perpetuity. The mere possibility of extension does not transform this temporary decree into a permanent one. *Stuart,* 951 F.2d at 454–55. "The temporary nature of this remedy ensures that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate." *Fullilove,* 448 U.S. at 513, 100 S.Ct. at 2792.

The race-conscious provisions of the decree are sufficiently flexible. The decree's employment goals are appropriately characterized as goals, not quotas. While the Supreme Court has indicated that rigid quotas are inconsistent with the flexibility necessary for narrow tailoring, *Croson,* 488 U.S. at 508, 109 S.Ct. at 729, the Court is more favorably disposed toward hiring goals. *Wygant,* 476 U.S. at 283, 106 S.Ct. at 1852 ("hiring goals impose a diffuse burden, often foreclosing only one of several opportunities"). In the instant case, the proposed decree provides that it "shall not be construed to require the Defendants or any of the colleges to hire or promote any person, regardless of race, who is not qualified for the position in question, or to preclude them from hiring or promoting the best qualified applicant regardless of race." With such a provision, the decree's goals will operate flexibly and not rigidly as quotas.

Furthermore, because the goals never require the defendants to hire an unqualified African–American, they will "never face[ ] the *Croson* situation, where in order to fill a rigid quota [they are] required to hire [African–Americans] for a job that no [African–Americans] are available, willing, or qualified to do." *Cone Corp.,* 908 F.2d at 917. The non-attainment of the employment goals is not a per se violation of the decree. In fact,

---

**33.** As will be discussed below, the race-conscious provisions of the proposed decree other than the employment goals have virtually no prejudicial effect on the rights of non-class members. That

is, although race-conscious, these provisions cause no harm to non-class members and are of less concern to the court.

the decree allows for modification of the goals if the court determines both that the defendants made a good faith effort to attain the goals and that the goals are not "reasonably attainable." Whether a goal is reasonably attainable "depend[s] on such factors as the nature and number of vacancies which shall occur during the term of [the] decree, the number and availability of Black persons who meet the job requirements of the positions in question, and the number of Black persons meeting the job requirements who shall be desirous of applying for the vacancies which shall become available." If a goal is not reasonably attainable despite the defendants' good faith efforts, "the [c]ourt shall reevaluate such goal to determine whether or not the [c]ourt should order that it and related subsequent goals should be modified by the State Board of Education so as to be more reasonably attainable." Finally, an institution that meets its goals is excused from further relief even though the system as a whole does not meet the employment goals. Because the decree envisions flexible application of the employment goals, and because all provisions are temporary, the proposed decree survives this prong of the narrow-tailoring analysis.

### c. Over– and Under–Inclusiveness

The court must also "examine the relationship between the numerical relief ordered and the percentage of [African–Americans] in the relevant work force." *Paradise*, 480 U.S. at 179, 107 S.Ct. at 1070.[34] The proposed decree contains two types of goals for the covered positions: 25% African–American employment system-wide, and African–American employment at each institution at a rate equal to 75% of the African–American population in the relevant geographic area.[35]

As discussed above, because the defendants failed to establish and use objective employment criteria, it is not possible to examine the relationship between the goals and the relevant labor force. Thus, the court cannot say conclusively that the goals represent that number of available and qualified African–Americans who would have been employed in the covered positions by 1999 in the absence of racial discrimination. Nonetheless, the court finds that both types of goals contained in the decree are narrowly tailored under the present circumstances to remedy the past identified discrimination.

First, the court finds the 25% goal, which is based on the court's order in *Lee v. Macon* in 1970, to be an appropriate goal system-wide. Existing African–American employment in the covered positions ranges from 15.1% to 22.2%. Because these levels of African–American employment were achieved within a discriminatory system, the court is convinced that a sufficient number of qualified African–Americans—over-and-above those currently employed—is available for employment by the defendants. The 25% goal, therefore, is not over-inclusive and is within the grasp of the defendants. If anything, given the history of discrimination in the postsecondary system, the 25% goal is under-inclusive.[36]

Second, the goals geared to 75% of the African–American population in each institution's geographic area are also appropriate. To hold that these goals are over-inclusive would require the court to conclude that African–Americans in each region are less than 75% as likely to be qualified for the covered positions as whites in the same region. The court is unwilling to make such a conclusion. "[A]bsent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which the employees are hired." *Teamsters*, 431 U.S. at 340 n. 20, 97 S.Ct. at 1857 n. 20. Again, but for the

---

**34.** Because the proposed decree seeks to remedy only discrimination against African–Americans, there is no over- or under-inclusiveness of other beneficiaries in the sense condemned by a plurality of the Supreme Court in *Croson*. 488 U.S. at 506, 109 S.Ct. at 728.

**35.** Because each institution has only one president, there is no institutional-level goal for presidents. Rather, presidents are included in the 25% system-wide goal.

**36.** Because the court does not have statistics showing the qualified labor pool, however, it has no basis to conclude that the goals are under-inclusive.

fact that the court cannot determine the size of the qualified labor pool, the more likely conclusion would be that the 75% goal is under-inclusive.

But third and most importantly, although it appears probable from these circumstances that the employment goals in the proposed decree are sufficiently narrowly tailored and seek to do no more than compensate for past discrimination, the court need not ultimately rely on this probability. Once the decree is in effect, the defendants will establish objective minimum qualifications for all covered positions. The defendants' hiring and promotion decisions will then be based on objective minimum qualifications and it will be possible to measure the qualified labor pool. The parties, at the suggestion of the court, have agreed that if the goals prove not to be appropriate—that is, are either over- or under-inclusive based on new and reliable information about the relevant labor pool—a party may request that the court adjust the goals in light of the new information.

Moreover, aside from this additional agreement, the decree itself provides for a process, albeit a more limited one, to ensure that the goals are not over-inclusive. As stated earlier, if the court determines both that the defendants made a good faith effort to attain the goals and that the goals are not "reasonably attainable," the decree allows for modification of the goals. One factor in the court's determination whether a goal is "reasonably attainable" is "the number and availability of Black persons who meet the job requirements of the positions in question." Thus, upon a finding that the defendants, although acting in good faith, have been unable to attain the goals, the decree allows the court to modify the goals in part based on a determination that the goals are over-inclusive and not reflective of the qualified labor pool. The court, therefore, may reevaluate the goals for over-inclusiveness in two circumstances: first, if there is a determination that the goals are not appropriately tied to the qualified labor pool, and, second, if the goals are otherwise reasonably unattainable despite the defendants' good faith efforts at compliance.

In conclusion, the court finds that the proposed decree has built-in mechanisms to ensure that the goals become narrowly tailored to the relevant labor pool, if they are not already so, and remain narrowly tailored throughout the life of the decree. This prong of the narrow-tailoring requirement is satisfied.

#### d. *Impact on Third Parties*

█ Finally, the court must ensure that the race-conscious provisions of the proposed decree do "not impose an unacceptable burden on innocent third parties." *Paradise*, 480 U.S. at 182, 107 S.Ct. at 1072. First, the race-conscious provisions other than the goals impose almost no burden on third parties. Provisions opposed by certain white objectors, such as affirmative recruitment, the maintenance of a statewide bank of qualified African–American applicants, and 40% membership on the recruitment and selection committee, have as their purpose and effect to ensure that sufficient numbers of qualified African–American applicants are fairly and objectively considered. As the Supreme Court wrote in *Paradise*, "[q]ualified white candidates simply have to compete with qualified black candidates." *Id.* at 183, 107 S.Ct. at 1073.

Nor are the employment goals an undue burden on third parties. They do not serve as an "absolute bar" to white advancement, *Sheet Metal Workers*, 478 U.S. at 481, 106 S.Ct. at 3053, but rather impose a burden that is "relatively diffuse." *Howard*, 871 F.2d at 1009. The goals are in no way as drastic as the layoff requirement found constitutionally impermissible in *Wygant*. 476 U.S. at 283, 106 S.Ct. at 1851. The goals are not even as burdensome as the "dual list" approach approved by the Supreme Court in *Paradise* and the Eleventh Circuit in *Howard*. All applicants are considered simultaneously, and because the decree does not preclude the defendants from "hiring or promoting the best qualified applicant regardless of race," no position is ever closed to white applicants.

At the very worst, some white applicants' attempts to be hired or promoted will be delayed. As the Eleventh Circuit has written, "[a]lthough some white [employees] will

have their promotions delayed, it is uncertain whether any individual [employee], white or black, would have achieved a different [salary level], or would have achieved it at a different time, but for" the employment goals. *Howard,* 871 F.2d at 1010. It is the class of African–Americans in this case who have been "delayed" for many years in their progress within the postsecondary system; it is not inequitable or unlawful for white employees to experience some delay in order for African–American employees to move into their rightful place. Because none of the race-conscious provisions of the decree "unnecessarily trammel the rights" of third parties, the proposed decree survives this final prong of the narrow-tailoring analysis. *Paradise,* 480 U.S. at 183, 107 S.Ct. at 1073.

## III. CONCLUSION

For the reasons given above, the court holds that the proposed partial decree warrants approval. Its provisions are fair, adequate, and reasonable, and overwhelmingly supported by class members. Its race-conscious provisions are narrowly drawn and justified by the compelling interest in remedying past discrimination. Furthermore and for these same reasons, the court expects that this consent decree will be the final chapter and that, at the end of seven years, after almost four decades of court-ordered relief, this court and Alabama's postsecondary educational system will finally and completely part company. If there is full and timely compliance with the decree, the postsecondary system should be able to enter the new century having finally lived up to the longstanding obligations placed upon it in this century to redress fully its failure to provide to African–Americans the same opportunities for employment and advancement that have been and are now provided to white Americans.

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That all objections to the proposed partial consent decree are overruled; and

(2) That the joint motion for approval of the proposed partial consent decree, filed by plaintiff Humphrey L. Shuford and defendants Alabama State Board of Education, Chancellor Fred Gainous, and Malcolm A. Jones on November 19, 1993, is granted.

## *PARTIAL CONSENT DECREE*

1. This action was commenced on February 24, 1989, by plaintiff Humphrey L. Shuford. On April 20, 1989, Dr. Connie Johnson filed a motion to intervene. On June 21, 1991, the Court entered an order granting Shuford leave to file an amended complaint and granting Johnson's motion to intervene and allowing her complaint in intervention. On September 21, 1993, Karen Newton filed a motion to intervene and a complaint in intervention, which were allowed by the Court on October 19, 1993. This partial consent decree deals only with the claims asserted by Shuford, and not those asserted by Johnson and Newton.

2. Plaintiff Shuford, who is a Black person, alleged he had been denied promotion to a dean level position at Atmore State Technical College (now part of Jefferson Davis State Community College) on account of his race or ethnicity. Shuford alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. sec. 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. sec. 1981 and on Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. sec. 1973.

3. Plaintiff Shuford sought to prosecute this case as a class action on behalf of Black professional educators who have been or may be victims of race discrimination in Alabama's community, junior, and technical colleges. He contended, on behalf of himself and the proposed putative class, that historical circumstances created systematic barriers to equal opportunity in employment for Black professional educators throughout said community, junior, and technical colleges. Shuford sought appropriate declaratory and injunctive relief for himself individually and for the putative class as a whole.

4. Defendants denied all the material allegations of the amended Shuford complaint, challenged jurisdiction, and asserted various affirmative defenses, including but not limited to res judicata and collateral estoppel.

5. This decree is issued with the consent of Humphrey L. Shuford, the Alabama State Board of Education, and Chancellor Fred Gainous, without a trial of any contested issues. Plaintiff Shuford and Defendants have agreed to the entry of this decree to demonstrate their good faith and to avoid the risks, burdens and expense of continued litigation, and to promote full enforcement of federal civil rights laws. The parties have agreed to compromise their claims and defenses on the terms stated herein. It is expressly understood and agreed by the parties that by entering into this consent decree the Defendants are not, and shall not be construed as, in any manner admitting liability; nor do the Defendants admit the material allegations of the Shuford complaint as amended.

6. This Court has in personam and subject matter jurisdiction sufficient to enter this consent decree, and venue is proper.

7. The Court has fully examined the terms of this consent decree and finds them to be reasonable, just, and in accordance with the Fourteenth Amendment to the Constitution of the United States, Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. sections. 1981 and 1983. Plaintiff agrees to a dismissal with prejudice of the claim asserted under the Voting Rights Act, 42 U.S.C. § 1973.

WHEREFORE, it is hereby ORDERED, ADJUDGED and DECREED, and Defendants Alabama State Board of Education and Chancellor Fred Gainous are hereby ENJOINED, as follows:

A. *Class Certification*

Plaintiff Shuford's motion to represent a plaintiff class defined as follows is granted: "A class of all Black citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree." The phrase "positions covered by this decree" as hereinafter used shall be construed accordingly.

B. *Nondiscrimination Policy and Goal of Decree*

1. It is the intent of the parties that all junior, technical and community colleges which are or which shall become a part of the Alabama System of Postsecondary Education (referred to hereinafter separately or collectively as the "college" or the "colleges") shall be subject to this decree.

2. Defendants shall adopt the following as a written policy of the Alabama State Board of Education and the System of Postsecondary Education:

a. that no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including without limitation race, sex, or age and, to ensure this policy is effectuated in a manner which advances the purposes and goals of this decree,

b. that all persons participating in selection procedures for professional employees shall take all action necessary to foster Black persons having equal and effective participation in the personnel decision-making process.

3. Defendants shall adopt as a written policy of the State Board of Education that the employment goals stated hereafter shall be employment goals for the appointment of Black persons to positions covered by this decree at State community, junior, and technical colleges; and shall cause the colleges and the Department of Postsecondary Education to implement the Board's policy using their best good-faith efforts, recognizing the spirit and principles underlying the policy. Where particular salary schedules are indicated, the goals stated below shall apply to any equivalent successor salary schedule or schedules which may be established by the State Board of Education. As provided in

Section A., it is the parties' intent that this decree include within its coverage all presidential, full-time faculty, and other full-time administrative and supervisory positions regardless of whether the position is shown on the formal A, B, C, or D salary schedule. For purposes of this decree, "full-time" shall mean 35 or more duty hours per week.

Inasmuch as the respective colleges are currently being reviewed in terms of redefining their respective service areas, and inasmuch as their service areas are subject to being revised or eliminated should the State Board of Education deem such revision or elimination to be appropriate, then for the purposes of this consent decree the term "primary service area" shall mean such geographic area as the State Board of Education and Chancellor shall submit to this Court as each respective college's primary service area. The primary service areas designated for the purpose of this consent decree shall not be binding upon any college or the State Board of Education for any other purposes, unless expressly adopted for such other purpose(s) by the State Board of Education. The State Board and Chancellor shall submit such service area designations to the Court by no later than 120 days after the effective date of this decree. If plaintiffs contend that the service areas so designated have the purpose or effect of materially thwarting achievement of the employment goals established in this decree, they may file appropriate objections with the Court.

The following employment goals are being established in good faith by the parties to this consent decree with the mutual understanding that the extent to which the respective goals are reasonably attainable shall depend on such factors as the nature and number of vacancies which shall occur during the term of this decree, the number and availability of Black persons who meet the job requirements of the positions in question, and the number of Black persons meeting the job requirements who shall be desirous of applying for the vacancies which shall become available. Therefore, in any instance where any of the following goals is not met, this Court shall reserve the authority to conduct a hearing on the matter of the degree to which the Defendants shall have exercised good faith efforts to reach each such goal. In the event of a finding of a lack of good faith effort on the part of any Defendant, this Court shall order such additional measures as shall be appropriate to ensure that a subsequent reasonable effort is made by the Defendants to reach the unmet goal.

In the event of a finding by this Court with respect to any unmet goal that the Defendants have nevertheless made a reasonable good-faith effort to attain such goal, the Court shall reevaluate such goal to determine whether or not the Court should order that it and related subsequent goals should be modified by the State Board of Education so as to be more reasonably attainable.

## GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS

(1) By the end of Fall Quarter 1996, the total number of Black college presidents shall be at least that number which most closely represents twenty-five percent (25%) of all college presidents.

(2) By the end of Fall Quarter 1996, the percentage of Black persons employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents seventy-five percent (75%) of the percentage of Black persons in the general population of the primary service area of the respective college.

(3) By the end of Fall Quarter 1995, the percentage of Black persons employed on the B and C1 Salary Schedule at all colleges combined shall be at least twenty-one percent (21%) of the total of all persons employed at the colleges on the B and C1 Salary Schedules. By the end of Fall Quarter 1997, this percentage shall be twenty-three percent (23%); and by the end of Fall Quarter 1999, it shall be twenty-five percent (25%).

(4) By the end of Fall Quarter 1996, the percentage of Black persons employed at each college on the C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents seventy-five percent (75%) of the percent-

age of Black persons in the general population of the primary service area of the respective college.

(5) By the end of Fall Quarter 1995, the percentage of Black persons employed on the C2 and C3 Salary Schedules at all colleges combined shall be at least twenty-one percent (21%) of the total of all persons employed at the colleges on the C2 and C3 Salary Schedules. By the end of Fall Quarter 1997, this percentage shall be twenty-three percent (23%); and by the end of Fall Quarter 1999, it shall be twenty-five percent (25%).

(6) By the end of Fall Quarter 1996, the percentage of Black persons employed at each college on the D Salary Schedule shall equal at least that number which most closely represents seventy-five percent (75%) of the percentage of Black persons in the general population of the primary service area of the respective college.

(7) By the end of Fall Quarter 1995, the percentage of Black persons employed on the D Salary Schedule at all colleges combined shall be at least twenty-one percent (21%) of the total of all persons employed at the colleges on the D Salary Schedule. By the end of Fall Quarter 1997 this percentage shall be twenty-three percent (23%); and by the end of Fall Quarter 1999, it shall be twenty-five percent (25%).

These goals shall not be deemed to be "quotas" as that term is generally applied, and the non-attainment of any of the respective goals shall not be considered to be, per se, a violation of this consent decree. In addition, this decree does not contemplate that any current employee will be terminated, or otherwise adversely affected in his or her employment, in order that progress toward these goals be made; and neither the Defendants nor the colleges shall be required to take such measures. Further, this consent decree shall not be construed to require the Defendants or any of the colleges to hire or promote any person, regardless of race, who is not qualified for the position in question, or to preclude them from hiring or promoting the best qualified applicant regardless of race.

4. The Chancellor, or each of the colleges under the coordination of the Chancellor, shall report to the Court and the parties on or about October 1, 1994 and annually thereafter on or about the same date for the duration of this consent decree, regarding the progress made toward achieving the goals set out above. Any extenuating circumstances or conditions which may have affected a college's progress may be identified in the report, including but not limited to (1) the number and nature of the positions available to be filled during the preceding period, (2) the number of Black applicants for the available positions, and (3) an analysis of the college's progress relative to the racial composition of the pool of potential employees who meet the job requirements of the available positions. In any proceedings to review the progress of any college, whether in connection with a motion for further relief or otherwise, nothing in this decree shall foreclose the Defendants or the college from advancing in their defense these or other relevant circumstances and conditions; provided, however, that it shall not be a defense for Defendants or the colleges to rely solely on such extenuating circumstances and conditions. Defendants and the college shall also be required to demonstrate they have taken affirmative measures and made good faith efforts to achieve the goals of this decree. A college which identifies or relies on such extenuating circumstances or conditions shall include in its annual report, in addition to those items required by Section E. of this decree, the following: (1) the names and addresses of all Black applicants for the positions available to be filled during the preceding period, (2) the names and addresses of potential Black applicants for such positions which the college secured, or which were available, from the statewide bank of information maintained by the Chancellor and the Department of Postsecondary Education pursuant to Section C.2.b. of this decree, and (3) a description of Defendants' and the college's efforts to recruit Black persons during the preceding period.

5. In the event a college is (i) meeting or exceeding the goals for that college set out above, or (2) is determined by the Court to have engaged in a concerted good-faith effort

to achieve those goals, but the system goals based on all colleges combined have not been met, plaintiffs shall not apply for, and the Court shall not impose, any further or additional relief against, or which would affect, the college whose goals have been met or pursued in good faith. Such college shall, however, remain subject to the provisions of this decree.

### C. *Practices and Procedures*

1. With the exception of temporary appointments, as provided in Section C.9. below, all vacancies in positions covered by this decree at the colleges shall be filled according to the practices and procedures set out hereinafter.

### 2. *Recruitment*

a. All employment practices and procedures of the colleges shall be governed by policies promulgated by the State Board of Education, and by any applicable court orders and state and federal statutes.

b. The Board, through the Chancellor of the Department of Postsecondary Education, shall establish and maintain during the term of this decree a centralized minority recruiting program designed to assist the colleges in making progress toward the minority employment goals set out above. This program shall include, but not necessarily be limited to, the following activities by the Department: (i) establishment and maintenance of a statewide bank of information regarding potential Black applicants for vacancies which may occur at the various colleges; (ii) on a regular basis, but at least annually, recruiting contacts, via letters and/or campus visits, with historically Black colleges or universities ("HBCUs"), including but not limited to Alabama A & M University, Alabama State University, Miles College, Stillman College, Talladega College, Tuskegee University, Atlanta University, Fisk University, Florida A & M University, Jackson State University, LeMoyne Owen University, Southern University, and Tennessee State University. These contacts shall advise students and/or existing faculty and staff at the institutions contacted of the availability of positions at the colleges and encourage them to apply for

such positions. The Chancellor shall make reasonable efforts to include representatives of the respective colleges in such recruiting visits to the HBCUs, on a rotating or other basis designed to offer the respective HBCUs and the respective colleges broad exposure to one another, and shall encourage the colleges to actively devote their recruiting visits and resources in a manner which fully includes the HBCU's; (iii) on a regular basis, but at least every three months, contacts with Bishop State Community College, Drake State Technical College, Lawson State Community College, and Trenholm State Technical College to obtain the name, address, educational background, previous experience, and area(s) of employment interest of each qualified Black applicant for employment who is not employed at the respective predominantly Black colleges because of an absence of vacancies in the applicant's area(s) of qualification and interest. The Chancellor shall thereafter cause each such qualified applicant to be contacted to ascertain the applicant's interest in applying for available faculty or staff positions at the various colleges which may have vacancies. If such interest is expressed, the Chancellor shall advise the presidents of colleges which may have vacancies in the potential applicant's area(s) of qualification and interest; and the president or his/her designee shall thereafter contact those qualified Black applicants in order to ascertain whether they wish to be considered for employment in an available position; (vi) [sic] review, at least bi-annually, of placement lists maintained by the Alabama State Department of Education, the Alabama Education Association, other relevant professional organizations and associations, and the public and private four-year colleges and universities in Alabama; and (iv) on at least an annual basis, publication in appropriate professional journals, publications and newspapers, including but not limited to *Black Issues in Higher Education,* the *Chronicle of Higher Education,* and the Alabama Education Association and Alabama Department of Education journals, a statement that the Department and each of the colleges (identified by name and location) are equal opportunity employers and that they

are seeking applications from Blacks in particular.

c. The president of each college, or the president's designee, shall, in connection with every vacancy which occurs in a faculty or staff position, contact the Department of Postsecondary Education, advise the Department of the nature of the vacancy, and obtain all relevant information available in the Department's information bank regarding potential Black applicants for such vacancy. Accurate records as to the dates of the request for and receipt of such materials shall be maintained as required by Section C.4.b.

d. Each college, on an annual basis and otherwise as vacancies occur, shall advertise all available vacant faculty and staff positions in at least one daily or weekly newspaper published in its service area and in at least one daily newspaper of regional or statewide coverage. These advertisements shall state that the college is an equal opportunity employer and that it is seeking applications from Black persons in particular. In addition, each such vacancy shall be reported to the Alabama State Employment Service, and, if feasible, shall be advertised in the Alabama Department of Education journal.

e. One or more representatives of each college shall make annual employment recruiting visits to at least one conference sponsored by predominantly Black (1) institutions of higher education, (2) professional associations, or (3) industrial organizations.

f. The president of each predominantly White college shall meet on at least an annual basis with Black community and educational leaders in and around the State of Alabama, and particularly in the college's service area, to discuss the recruitment of qualified Black applicants. Accurate records of the date, location, and persons attending said meetings shall be maintained as required by Section C.4.b.

g. In all the college's recruiting contacts required above, the president or the president's designee shall communicate to potential employment sources the policy of nondiscrimination set out in Section B.2.a. above.

3. *Job Descriptions*

a. Prior to the announcement of any vacancy in a faculty or staff position, the college shall develop a complete and accurate job description for the position, which shall contain at least the following:

(1) duties and responsibilities of the job;

(2) required education and work experience;

(3) required license, certification or other credentials; and

(4) all other special qualifications or requirements of the job.

b. Every job description shall be reviewed and appropriate revisions made at least annually by responsible supervisors.

4. *Application Process*

a. When a college has a faculty or staff vacancy, whether in a new position or an existing position, the college shall make every reasonable effort to procure applications from all interested, qualified persons. Each faculty and staff vacancy shall be advertised at the respective college, at the Department of Postsecondary Education, and at each of the other colleges. Vacancy announcements shall specify the salary range for the position to be filled. Vacancy announcements shall be published in time to give all interested persons a reasonable opportunity to respond to them, and they shall describe fully the duties, qualifications and selection criteria for the job. To facilitate distribution of vacancy notices among the colleges and to other interested parties, the Department shall publish and distribute on a regular and frequent basis a jobs newsletter or similar publication, listing job vacancies in a format suitable for posting and distribution at the respective colleges.

b. The following records shall be kept on file at each college concerning each vacancy, vacancy announcement and application received with respect to a position covered by this decree:

(1) all applications for employment, whether solicited or not;

(2) records of all interviews and other contacts with applicants, including a copy of each relevant piece of correspondence with applicants;

(3) a written evaluation of each applicant who met the minimum qualifications for an announced position;

(4) a written record of the response to each announced vacancy, including a list of all qualified persons considered for the vacancy, the name of the person offered the position, and the reasons for the selection;

(5) a copy of each letter, memorandum, report or other communication between college officials regarding the establishment or modification of an employment position, the announcement of a position, the recruitment of personnel, the selection process and the evaluation of applicants.

The aforementioned records shall be maintained for the duration of this decree and thereafter for a period of one year. The records shall be kept in an orderly manner, organized by calendar year and by position.

c. Upon the receipt of applications for a vacancy, applicants who meet the minimum requirements contained in the vacancy announcement shall have their education and experience verified. If verification is obtained, the applicant shall be invited for an interview and, if interviewed, shall be considered for employment; provided, however, that in any situation where the respective college shall receive more than 10 applications from persons who fully meet the announced minimum requirements, the president, in conjunction with the selection committee, shall have the option of conducting a preliminary screening of these applicants in order to determine a reasonable number, but not fewer than 10, to be interviewed. This determination shall be made by reference to Section C.5, below, and taking into consideration the goals and purposes of this decree. All applications, however, shall be maintained as required by Section C.4.b. The finalists, as determined by the prescreening, shall then each be interviewed. Where feasible, interviews shall be conducted in person. The college, however, shall not be under any obligation to pay the travel expenses of any applicant who is invited for an interview. If the college elects to pay such travel expenses, it shall do so in a manner which is non-discriminatory.

5. *Selection Criteria*

a. Selections of applicants for faculty and staff vacancies shall be based on the following criteria, all of which shall be spelled out in the job description for the vacant position:

(1) minimum education, certification and experience requirements, or a combination thereof, for the position;

(2) additional education, certification and/or experience considered desirable for the position;

(3) evidence of past performance and/or occupational competency that is accompanied by reliable indicia that it is free of racial bias;

(4) any particular needs of students or others who will work with or be served by the person selected; and

(5) the particular needs of the college and community it serves for racial, ethnic, and/or cultural diversity.

b. In addition, selection shall take into consideration the following criteria, which cannot be spelled out in the job description:

(1) any particular personal qualities and characteristics of any applicant that demonstrably enhance or detract from the applicant's ability to perform the job duties;

(2) the employment goals adopted by the State Board of Education pursuant to Section B.3. hereinabove; and

(3) the best interests of the college, its students, faculty and staff, and the public.

c. Except for the minimum education, experience and certification requirements, the preceding selection criteria shall be applied flexibly and in their totality and shall not be used to create rigid or mathematical measurements.

6. *Recruitment and Selection Committee*

a. Annually each college president shall appoint a recruitment and selection committee which shall make recommendations to the president. Nothing in this decree shall preclude the State Board of Education from adopting a policy regarding the appointment and composition of the committee, provided

that such policy is consistent with this decree. The size, composition and membership of the committee shall be determined by the president, but in any event shall include membership which is at least 40% Black. The president in his or her discretion may appoint additional committees from time to time, as need arises, so as to account for different academic disciplines, administrative service areas, or vocational areas in which vacancies may exist, or to enable vacancies to be filled in an efficient and timely manner. Any additional committee so appointed shall have at least 40% Black membership, but otherwise shall be constituted in a manner determined by the president. No committee shall be appointed or used for the purpose of frustrating the intent of this consent decree.

b. Each member of the principal committee appointed pursuant to this section shall review all recruitment procedures of the college for compliance with the provisions of this decree, and the committee shall file with the president a written report of its findings prior to the expiration of the president's current term of office.

c. Applications for all positions covered by this decree shall be screened by a committee. The committee shall interview the qualified applicants for each vacancy, as determined in accordance with Section C.4., above, and, using the criteria set out in Section C.5., above, shall recommend three applicants to the president (unless there are fewer than three qualified applicants, in which case all qualified applicants shall be submitted to the president). The committee's recommendations shall not be ranked but shall be listed in alphabetical order by last name.

### 7. Selection by the President

a. The president may select one of the applicants for the vacancy recommended by the committee. The president shall not select any person to fill the vacancy (except on a temporary basis, if necessary) except one of the applicants recommended by the committee; provided, however, that if the president deems it necessary to comply with the remedial objectives of this decree, the president may at any time reopen the application and selection process. In filling a vacancy on a temporary basis, the president shall be subject to the requirements of Section C.9.b.

b. The selection by the president from among the candidates recommended by the committee shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

### 8. Lateral Internal Transfers and Reorganization of Existing Positions

a. Notwithstanding the above procedures for filling vacant positions, in the event there shall be one or more employees at the respective college on permanent status in positions which are at least equivalent to a vacant position in terms of salary schedule and level of responsibility, the president of the college shall have the discretion, in lieu of external solicitation of applicants, to offer all such equivalently positioned employees the opportunity to apply for a lateral transfer to said vacancy. If at least one equivalently positioned Black person applies for the vacancy and the president selects a person who is not Black, the president's decision shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

b. In no instance may the president make such a lateral transfer except where all equivalently positioned employees have been given the opportunity to apply for and to be considered for the lateral transfer without discrimination on the basis of race or color. To enable the president to make a better informed decision consistent with the goals of this decree, no lateral transfer shall be made until the president shall have obtained from the Chancellor the names of potential Black applicants for the position from the statewide bank of information to be established and maintained under this decree. The president of the respective college shall have the discretion, after reviewing all applications for such lateral transfer and any information obtained from the Chancellor, to make the lateral transfer or to open the application process and receive additional applications from all other interested, qualified appli-

cants, with such process to be governed by any applicable provisions of this decree.

c. Recognizing that there may occasionally be situations where, for legitimate reasons not related to race, a college may find it necessary and appropriate to expand or otherwise modify an existing position, the college may do so without the position, as modified, being considered a vacancy subject to the provisions of this decree. Examples of such circumstances would include expanding the duties of an incumbent employee or reassigning duties among incumbent employees to avoid the necessity of hiring an additional employee; provided, however, that each proposed modification which involves a change of an existing employee's title, salary, placement, benefits, or level of supervisory responsibility shall be subject to the prior written approval of the Chancellor, who shall ensure and document to the Court and counsel for the plaintiff class prior to implementation of the subject modification that the modification is not being made on the basis of race and that the modification is necessary and appropriate given the college's circumstances. No action under this paragraph shall be taken for the purpose of frustrating the intent of this consent decree. Failure of plaintiff's counsel to object to a proposed modification under this paragraph at the time notice is given shall not be deemed a waiver of the right to contest said modification at a later date.

9. *Recruitment and Selection of Full-time Temporary Instructional, Administrative, or Professional Employees*

a. In certain limited instances, a college may employ a full-time employee on a "temporary" (as distinguished from "probationary") basis. A "temporary" position generally would be one which is either intended to last for one year or less or has been established for a trial period of one year or less to determine the feasibility of making the position permanent.

b. A temporary position which, if permanent, would be a position covered by this decree may be filled by the president, without compliance with the solicitation, hiring

and selection criteria and procedures mandated by this consent decree, including but not limited to use of a recruitment and selection committee, only when one or more of the following conditions exists:

(1) The college is in need of filling such a position for a period of one year or less.

(2) The college is the recipient of a non-renewable contract or grant which is for a period of twelve months or less, and the subject position is established or retained for the sole purpose of fulfilling the requirements of the contract or grant and will be eliminated upon the expiration of the contract or grant.

(3) The college is in need of immediately filling an unanticipated vacancy and is making a temporary appointment for a period of time in order to properly advertise and accept applications for normal "probationary" appointment to the position. In such instance, the college shall act expeditiously to fill the position on a permanent basis. It is not contemplated that, except in extraordinary circumstances, a temporary employee hired under this provision would remain employed in that capacity beyond the commencement of the academic year next following his or her being hired on a temporary basis.

c. In no instance will a person be allowed to hold a position which would otherwise be a position covered by this decree on a "temporary" basis for longer than twelve months. After that twelve month period, the position shall be filled, if at all, only by an employee selected in compliance with the solicitation, hiring and selection criteria and procedures mandated by this decree. No position shall be left unfilled for the purpose of frustrating the goals and purposes of this decree.

10. *Part-time Employees*

Should a college determine that it is necessary to employ part-time employees, it shall hire and utilize such part-time employees in a manner consistent with, and not calculated to frustrate, the intent of this consent decree. A college shall not engage in the excessive use of part-time employees, and the totality of the circumstances will be considered relating to the college's action.

D. *Reduction in Force Due to Merger or Consolidation*

1. It is currently the position of the Defendants that no merger or consolidation within the System of Postsecondary Education will be accomplished in a manner which will result in the termination or demotion of incumbent employees. In connection with any merger or consolidation which may occur, the Defendants presently intend for all incumbent employees at the affected colleges to retain all rights, privileges and benefits theretofore accruing to them, including, but not limited to, salary schedule placement, continuing service status (tenure), accrued leave, and date of initial employment.

2. If, in the event of a merger, consolidation or other material restructuring involving one or more of the colleges, it is nevertheless determined that a reduction in force and/or demotions are necessary with respect to employees in positions covered by this decree, the reduction in force or demotions shall be accomplished in a manner consistent with the policy of nondiscrimination and minority employment goals embodied in this decree. For purposes of this provision, "demotion" shall mean (1) any material reduction in duties or responsibilities, or (2) any reduction in pay.

3. If it appears to Defendants that a reduction in force or demotions may become necessary as a result of a proposed merger, consolidation or other material restructuring, Defendants shall promptly advise counsel for the Plaintiff class of this possibility. If a merger, consolidation or restructuring plan is to be implemented which actually includes a reduction in force or demotions, Defendants shall give notice of such plan to counsel for the Plaintiff class and the employees to be terminated, laid off or demoted not later than 90 days prior to the date on which the reduction in force or demotions are to become effective; provided, however, that implementation of the plan shall not be delayed so long as Defendants give the required notice as timely as possible and in good faith.

4. Any employee in good standing who is designated to be terminated, laid off, or demoted as a result of a merger, consolidation or other material restructuring shall be provided information by the college, working through and with the Department and the Chancellor, regarding existing vacancies at the other colleges for which the employee may be qualified. In the event such a vacancy is identified and the employee desires to apply for it, Defendants and the colleges shall facilitate submission and consideration of the application, and make their best efforts to afford an interview before the employee suffers economic loss with respect to the employee's prior employment. Nothing in this paragraph shall require any college to actually employ an employee who is terminated, laid off or demoted as a result of a merger, consolidation or other material restructuring, but any college may elect to employ such an employee.

5. The name of any Black employee in good standing who is terminated, laid off or demoted due to a merger, consolidation or other material restructuring, but who is not successful in relocating to another college under the provisions of the preceding paragraph, shall be provided forthwith by the college to the Chancellor. The Chancellor shall maintain the name and relevant information regarding such employee in the statewide bank of information to be established and maintained pursuant to Section C.3.b. of this decree, and shall advise the colleges of the potential availability of such employee in connection with the inquiries regarding potential Black applicants which the colleges are required to make under Section C.3.c. of this decree. Consistent with Section C.3.b. of this decree, the Chancellor shall contact and advise each displaced Black employee of the availability of positions at the respective colleges for which the employee may be qualified. Notwithstanding any other provision of this consent decree, any displaced Black employee who meets the minimum qualifications for a vacant position at one of the colleges, shall, upon application for the position, be accorded an interview.

6. In identifying incumbent employees to be terminated, laid off, or demoted as the result of a merger, consolidation or other material restructuring, the following non-racial objective criteria (where applicable) shall be employed:

a. Area or field of teaching or other employment expertise;

b. Degree(s) earned;

c. Other education achieved; certificates or diplomas earned;

d. Teaching experience:

(i) at the college(s) involved in the restructuring;

(ii) in the instructional field;

(iii) in other college(s) within the System of Postsecondary Education;

(iv) in other higher education; and

(v) in other schools.

e. Employment experience:

(i) at the college(s) involved in the restructuring;

(ii) in other college(s) within the System of Postsecondary Education;

(iii) positions held;

(iv) duties performed;

(v) in other higher education;

(vi) in other schools; and

(vii) in other comparable or relevant employment.

7. Any employee who is terminated or laid off due to a merger, consolidation or other material restructuring shall be afforded the opportunity for reemployment at the college, or its successor institution, if a position for which the employee is qualified becomes available, and if the employee otherwise meets all requirements for employment at the college. Any employee demoted due to a merger, consolidation or other material restructuring shall be afforded the opportunity for promotion to the employee's former rank or status, if a position for which the employee is qualified becomes available and if the employee is otherwise in good standing at the time.

8. To implement the provisions of the preceding paragraph, employees terminated, laid off or demoted shall be given priority for filling a vacancy for which they are qualified, and no such vacancy shall be filled until the displaced employee who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so within a reasonable period of time. An employee who fails to accept such an offer for a position which is equivalent or substantially equivalent to the position held prior to the employee's displacement shall no longer be entitled to the protections of this and the preceding paragraph.

9. The provisions of this Section D. shall apply only with respect to employees who, at the time of a decision to terminate, lay off or demote, occupy a position covered by this decree.

E. *Reporting Requirements*

The Chancellor shall file with the Court, or cause to be filed by the presidents of the colleges, on or about October 1, 1994, and annually thereafter on or about the same date for the duration of this consent decree, a report describing fully defendants' efforts to comply with the provisions of this decree, including without limitation the following information for each college and for the Postsecondary System as a whole:

1. The number and percentage of Blacks, Whites, and others employed in positions covered by this decree:

(a) as of September 30, 1993;

(b) as of the effective date of this decree; and

(c) as of September 30 of the year of the report.

Reports after the first report shall also include all the above information which was contained in the next preceding annual report.

2. The name, race and position filled of every person selected to fill a position covered by this decree during the period covered by the report, indicating whether each vacancy was filled permanently, by lateral transfer or as a full-time temporary position;

3. The name and race of every member of the recruiting and selection committee(s) who was appointed or served during the period covered by the report;

4. The name, race, and position held of any part-time employees during the period covered by the report.

F. *Right of Inspection*

Upon submission to the Chancellor and the affected college of written advance notice of not less than 10 working days, counsel for

the plaintiff class shall have the right to visit a representative college and inspect and copy the records required by Section C.4.b. above to be maintained at the various colleges.

G. *Individual Relief*

1. Plaintiff Humphrey L. Shuford shall be granted non-probationary status ("tenure") as Dean of Extended Services at Jefferson Davis Community College effective immediately upon the date this decree is entered. In addition, Defendants Alabama State Board of Education and Chancellor Fred Gainous shall cause to be paid by Jefferson Davis State Community College (which includes the institution formerly known as Atmore State Technical College) to Plaintiff Shuford compensatory damages in the amount of forty-five thousand dollars ($45,000.00). Upon payment of this amount to Plaintiff Shuford, Defendants Malcolm A. Jones and Jefferson Davis State Community College (including Atmore State Technical College) shall be dismissed with prejudice.

2. Plaintiff Shuford shall assume individual responsibility for any tax, social security, or Teachers Retirement System report or contribution which may accrue to or be required from him as a result of the award of compensatory damages.

H. *Release from Claims*

Plaintiff Humphrey L. Shuford agrees that upon the entry of this decree he shall consider the relief stated herein to resolve absolutely and completely any and all claims which he has filed or could have filed in this action as of the effective date of this decree against any of the Defendants or against the State of Alabama, or any official or representative thereof, concerning his employment, or any application for employment or any term of condition of employment, at Atmore State Technical College, Jefferson Davis State Community College, or any other college which is among those institutions controlled and administered by the State of Alabama Board of Education.

I. *Attorney's Fees*

Although Defendants do not in any manner admit liability under the Shuford complaint, as amended, they acknowledge that, for purposes of an award of attorney's fees pursuant to 42 U.S.C. § 1988, Plaintiff Shuford, individually and as class representative, is the prevailing party. If the parties are unable to agree upon the amount of fees and expense to be paid plaintiff, plaintiff shall file his request for attorney's fees and expenses not later than thirty (30) days after final approval of this decree.

J. *Term of Decree and Dismissal of Parties and Claim*

Jurisdiction of this action for such other and further relief or enforcement proceedings as may be appropriate consistent with this decree is hereby retained for a period of seven years (during the last two of said seven years the case will be moved to the Court's "inactive" docket) from the effective date of this decree, unless, upon the motion of one or more of the parties or upon the Court's own motion and for good cause shown, it is sooner modified, dissolved or extended by further order of this Court. This decree shall be binding upon the State of Alabama Board of Education and/or any of its successors or assigns. The individual defendants in their individual capacities are hereby DISMISSED with prejudice, and plaintiffs' claim under the Voting Rights Act, 42 U.S.C. § 1973, is hereby DISMISSED with prejudice.